Robert **ESCALERA**, Petitioner,

v.

Philip **COOMBE**, Superintendent of Eastern Correctional Facility, Respondent.

No. 85 Civ. 1698.

United States District Court, E.D. New York.

Jan. 30, 1987.

See also 402 N.Y.S.2d 700.

Peter J. Avenia, Gombiner and Avenia, New York City for petitioner.

Leonard Joblove, Asst. Dist. Atty., (Elizabeth Holtzman, Dist. Atty., and Barbara D. Underwood and Peter A. Weinstein, Asst. Dist. Attys., of counsel), Brooklyn, N.Y., for respondent.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Petitioner Robert Escalera is serving a sentence of fifteen years to life upon his conviction of felony murder in violation of N.Y. Penal Law §§ 125.25(3) (McKinney 1975). After the judgment of conviction was entered on September 24, 1976, the appellate division affirmed Escalera's conviction on February 27, 1978, 61 A.D.2d 890, 402 N.Y.S.2d 700. On June 9, 1978, Escalera was denied leave to appeal to the New York Court of Appeals. The trial court denied Escalera's motion to vacate the judgment, N.Y. Crim.Proc.Law § 440.-10 (McKinney 1983), on August 3, 1981. This petition for a writ of habeas corpus, 28 U.S.C. § 2254, followed.

The petition raises two arguments. First, Escalera contends that the state trial court denied him due process, as well as his sixth amendment right to call witnesses, when it precluded him from calling his brother, Peter Escalera, as an alibi witness. Second, Escalera argues that he was denied due process when the trial court admitted identification testimony that suffered from an impermissibly great danger of misidentification. The State maintains that the first claim was never presented to the state courts and that, because it is unexhausted, the entire petition must be dismissed. Additionally, the State disputes the merits of each of Escalera's two arguments.

For the reasons that follow, the court finds that Escalera has exhausted his state remedies within the meaning of 28 U.S.C. § 2254(b) and (c), but that he is not entitled to habeas relief on the merits. Accordingly, the petition is dismissed.

### I. *Background*

On August 18, 1975, at approximately 6:00 p.m., Pasquale Nieves and Felix Torres went for a walk in Fort Greene Park in Brooklyn. They were accompanied by Jesus Cordero, his young son, and another friend. After they had been in the park for about thirty minutes, a man approached and asked if they had seen his dog. Shortly thereafter, four young men came up to that man and one asked whether he would give them money if they found his dog. The man said that he had no money.

Nieves and Torres, together with their friends, walked with the man who was looking for his dog. The four young men followed them. After approximately three to five minutes, the four young men stopped Nieves, Torres, and friends, indicating that it was a holdup. One of the four held a revolver, while the other three had knives.

Cordero, who was holding a small baseball bat, swung at the gun hand of the man with the revolver. He missed, and the man shot him. The four young men ran away, and Cordero died several days later of the single gunshot wound to his chest.

Nieves and Torres ultimately identified Robert Escalera as the gunman. Before trial, Nieves, Torres, and Detective Harold Ruger testified at a *Wade* hearing, *see* *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and the trial judge concluded that Nieves and Torres would be permitted to identify Escalera to the jury at his trial.

### II. *The Preclusion Sanction*

In addition to testifying in his own defense, Robert Escalera called his friend Samuel Gonzalez as an alibi witness. Gonzalez, who knew Escalera for eighteen or twenty years at the time of the trial

(T270),[1] testified that he met Escalera coming off a bus at 5:30 on the afternoon of the shooting (T272). According to his testimony, Gonzalez walked with Escalera to the latter's house (T273), left him there (*id.*), and then returned to Escalera's house at approximately 6:40 (T274). The two were together until approximately 7:30 (T274–81). This testimony was offered to negate the possibility that Escalera had been at the scene of the shooting when it took place, at approximately 6:30.

At the commencement of an afternoon session during Escalera's direct examination, his attorney advised the court—for the first time—that he intended to call Peter Escalera, the defendant's brother, as an alibi witness (T232). Counsel represented that it had been his intention to call Escalera's father, but that he changed his mind because the father was "very nervous" and "a cardiac patient [who] has to go for treatment on a regular basis" (*id.*). Peter Escalera was prepared to testify that his brother had been at home between 6:00 and 6:30 p.m. (*id.*). Before this colloquy, Escalera had not given notice that either his father or his brother might be called as an alibi witness.

The prosecutor was unimpressed by defense counsel's suggestion that he be given an opportunity to question the proposed alibi witness before he was to take the stand (T233). He stated: "I ask that the witness be precluded and that I be given ample opportunity to examine these witnesses with a stenographer present" (*id.*).[2] He also found it "strange" that he had heard nothing of Peter Escalera's proposed testimony until after the luncheon recess, even though the prospective witness had been in court all morning (*id.*).

The trial judge precluded Peter Escalera's testimony, in view of New York's

statutory requirement that criminal defendants provide, upon a demand by the prosecution, a list of alibi witnesses (T234). *See* New York Crim.Proc.Law § 250.20(1) (McKinney 1982). The notice of alibi statute provides:

> If at the trial the defendant calls such an alibi witness without having served the demanded notice of alibi, or if having served such a notice he calls a witness not specified therein, the court may exclude any testimony of such witness relating to the alibi defense. The court may in its discretion receive such testimony, but before doing so, it must, upon application of the people, grant an adjournment not in excess of three days.

*Id.* § 250.20(3).

The trial judge emphasized that Peter Escalera was not a witness whom the defendant would have had trouble locating (T234). To the contrary, "[h]e is a member of the family fully known to the defense throughout" (*id.*). Additionally, the trial judge noted the lateness of the application for leave to call the alibi witness (*id.*).

At the conclusion of all testimony, defense counsel renewed his application (T290). The trial judge responded:

> You seem to forget, Mr. Ortiz, that all of us, judges, defense attorneys, assistant district attorneys are under constant pressure to try cases and to dispose of cases that have been pending for a long time. We have had several discussions as this case has progressed. I have already made commitments which upon returning to my chambers I will start making phone calls for the next case to be tried.
>
> I'm going to repeat that here we have a proposed witness, a member of the family, a brother of the defendant with notice having been given some time ago.

---

**1.** Numerals preceded by "T" are references to the trial transcript.

**2.** The prosecutor referred to "witnesses" in the plural because Escalera also proffered the testimony of Hector Ramos, who was not an alibi witness. Ramos's testimony is not at issue in this habeas petition.

I don't have the date of alibi witnesses. And the name of a member of the family, a brother of the defendant, was not among those.

You're asking me now to upset my whole schedule, the case that I anticipate calling for trial after I make several phone calls. And what you are proposing at this late hour could very well have been done a long time ago.

I have been given no reason, no plausible reason why the name of the defendant's brother was not originally included in the alibi notice when there was ample time for the District Attorney to have had the opportunity to speak to this witness. I have heard nothing as to why this name was not included earlier. If you have any reason, then state it for the record [T291–92].

Defense counsel answered that he initially intended to stay away from calling family members as witnesses, because the jury might feel that relatives would lie on behalf of the defendant (T292). Escalera's attorney added, cryptically: "And there was only a question as to whether the father who was the one who was in the better position to observe what happened in the apartment would be the witness" (T292–93).[3] Counsel continued that the prosecution would not be prejudiced by admission of the alibi testimony, since "Mr. Escalera and his father have been to the precinct and they have discussed the case with the investigating detective in this case" (T293).[4] The trial court adhered to its earlier ruling and the defense rested (T294). Escalera now contends that the order precluding his brother's alibi testimony violated the sixth amendment.

## A. *Exhaustion of State Remedies*

◼ The State contends that Escalera failed to exhaust his state remedies on the sixth amendment claim, as required by 28 U.S.C. § 2254(b) and (c). "It has long been settled 'that a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus.'" *Gandia v. Hoke,* 648 F.Supp. 1425, 1427 (E.D.N.Y. 1986) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)).

In *Daye v. Attorney General of the State of New York,* 696 F.2d 186, 194 (2d Cir.1982) (en banc), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984), the court listed four ways in which the exhaustion requirement might be met, even without citation to the relevant constitutional provision:

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegtion of a pattern of facts that is well within the mainstream of constitutional litigation.

The State makes much of the fact that Escalera's brief to the appellate division alleged that the trial court had abused its discretion under section 250.20 of the Criminal Procedure Law. According to the State, this demonstrates that there was nothing constitutional about Escalera's argument to the state courts. But, among other things, Escalera's brief said the following about *People v. Merritt,* 396 Mich. 67, 238 N.W.2d 31 (1976): "The Court noted that a judge's choice to invoke preclusion jeopardizes *the fundamental and important Constitutional right* of a defendant to have compulsory process for obtaining witnesses in his favor." Brief for Defendant-Appellant at 48, *People v. Escalera* (2d Dep't 1978) (emphasis added). At a minimum, *Merritt* is a state case employ-

---

**3.** This remark followed the statement that defense counsel had shied away from Escalera's relatives because they might be distrusted by the jury; it also fails to explain why Escalera's father was omitted from the list of alibi witnesses.

**4.** In his memorandum of law in support of the habeas petition, Robert Escalera reads "Mr. Es-

calera" as a reference to his brother Peter. The court is of the view that, in context, "Mr. Escalera" seems more likely to apply to Robert. The discrepancy has no bearing on the court's disposition of this petition.

ing constitutional analysis in a similar fact situation (satisfying part (b) of the *Daye* test) and use of the term "compulsory process" called Escalera's sixth amendment rights to mind (satisfying part (c) of the *Daye* test). What is more, "[i]t is inconceivable that in finding 'no abuse of discretion' [the appellate division] did not implicitly hold that preclusion did not violate petitioner's right to due process of law." *Hackett v. Mulcahy,* 493 F.Supp. 1329, 1335 (D.N.J.1980). Because the court finds that Escalera has satisfied at least two branches of the *Daye* test—either one of which would have been sufficient—it concludes that he has exhausted his state remedies. Accordingly, the court turns to the merits.

B. *The Sixth Amendment and Preclusion*

■ "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor...." U.S. Const. amend. VI. The defendant's right to compulsory process was applied to the states, through the due process clause of the fourteenth amendment, in *Washington v. Texas,* 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1922–1923, 18 L.Ed.2d 1019 (1967). The Supreme Court later turned its attention to alibi notice statutes, and held that they may not be enforced "unless reciprocal discovery rights are given to criminal defendants." *Wardius v. Oregon,* 412 U.S. 470, 472, 93 S.Ct. 2208, 2211, 37 L.Ed.2d 82 (1973). Inasmuch as section 250.20(2) of New York's Criminal Procedure Law provides for reciprocity—i.e., disclosure by the prosecution of alibi rebuttal witnesses—the statute passes the *Wardius* test. Escalera does not contest this. Instead, he maintains that the trial court's use of section 250.-20(3) to preclude his calling his brother as an alibi witness violated the sixth amendment.

*Wardius* declined to decide whether a valid alibi notice statute could be enforced by an order precluding the testimony of alibi witnesses. 412 U.S. at 472 n. 4, 93 S.Ct. at 2211; *accord Williams v. Florida,* 399 U.S. 78, 83 n. 14, 90 S.Ct. 1893, 1897 n. 14, 26 L.Ed.2d 446 (1970). On three recent occasions, the Supreme Court has been one vote away from accepting a case that would decide the issue. *See Lane v. Enoch,* —— U.S. ——, 106 S.Ct. 1281, 1281, 89 L.Ed.2d 588 (1986) (White, J., joined by Burger, C.J., and Rehnquist, J., dissenting from denial of *certiorari*); *Smith v. Jago,* 470 U.S. 1060, 1060–61, 105 S.Ct. 1777, 1777–78, 84 L.Ed.2d 836 (1985) (White, J., joined by Burger, C.J., and Brennan, J., dissenting from denial of *certiorari*); *Taliaferro v. Maryland,* 461 U.S. 948, 948–50, 103 S.Ct. 2114, 2114–15, 77 L.Ed.2d 1307 (1983) (White, J., joined by Brennan & Blackmun, JJ., dissenting from denial of *certiorari*).[5]

The closest Second Circuit precedent located by the court is *Ronson v. Commissioner of Correction of the State of New York,* 604 F.2d 176 (2d Cir.1979) (per curiam). In *Ronson,* the court of appeals affirmed a grant of habeas corpus in favor of a petitioner who had been precluded from introducing the testimony of a psychiatrist because he had failed to comply with a New York statute requiring notice of an insanity defense. After noting that the sixth amendment right to compulsory process had been incorporated against the states, the Second Circuit observed:

While a defendant's right to call witnesses on his behalf is not absolute, a state's interest in restricting who may be called will be scrutinized closely. In this regard, maximum "truth gathering," rather than arbitrary limitation, is the favored goal.

*Id.* at 178 (citations omitted).

It was important to the *Ronson* court that defense counsel had "substantially complied with the notice requirements,"

---

5. It is interesting to note that the only justice who dissented from denial of *certiorari* in all three cases was Justice White. Had any three of the other justices who joined his dissents in one case or another all joined in one case, the issue would have been presented to the Supreme Court. Few would dispute Justice White's observation that the issue "will surely not disappear of its own accord," *Smith v. Jago, supra,* 470 U.S. at 1061, 105 S.Ct. at 1778.

**1322**

*id.,* that counsel "did not intend or attempt to hide the issue from the state or the court," *id.* at 179, and that "he gave actual notice in all but precise form," *id.* Indeed, the defendant's request to introduce psychiatric testimony was denied in a second trial, after a mistrial had been declared in the first case in which the request had been made belatedly. *Id.*

*Ronson* does not provide much guidance in this case, because Escalera did not advise the prosecution or the court of his intent to call his brother as an alibi witness until well into the defendant's case. Whereas *Ronson* took care to guarantee that the form of the state's notice statute would not take precedence over the substance of the sixth amendment, here the failure to comply with the notice statute was more than merely a matter of form. Indeed, given the timing of Escalera's application and the absence of a good reason for its lateness, "[p]ermitting a continuance for further investigation as the sole sanction"—Escalera's suggestion—"is equivalent to abolishing alibi notice altogether," Comment, *Alibi Notice Rules: The Preclusion Sanction as Procedural Default,* 51 U.Chi.L.Rev. 254, 276 (1984) (footnote omitted).

The question remains, however, whether preclusion is ever an acceptable sanction for failure to comply with an alibi notice statute. In *United States v. Davis,* 639 F.2d 239 (5th Cir.Unit B Mar.1981), the court ordered a new trial for defendants who had been precluded from calling witnesses to impeach the character of a confidential informant. *Davis* held "that the compulsory process clause of the sixth amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders against criminal defendants." *Id.* at 243. The holding rested on the notion "that the exclusion of relevant, probative, and otherwise admissible evidence is an extreme sanction that should be used only when

justified by 'some overriding policy consideration.'" *Id.* (quoting *Braswell v. Wainwright,* 463 F.2d 1148, 1156 (5th Cir.1972)). *Davis* found no such "overriding policy consideration" where a defendant failed to comply with a discovery order, because such "orders are designed to prevent surprise, not to protect the integrity of the evidence sought to be presented." *Id.; see Hackett v. Mulcahy,* 493 F.Supp. 1329, 1336 (D.N.J.1980) ("The testimony of a defense witness may not be precluded because of defense counsel's failure to comply with court rules, unless the record reveals some complicity on the part of the defendant.").

Other courts have hesitated to adopt the per se rule of *Davis.* In a case frequently cited as setting forth a balancing test, *Fendler v. Goldsmith,* 728 F.2d 1181 (9th Cir.1984), the majority declined to choose either the *Davis* rule or a balancing test, holding that the exclusion of an important defense witness was impermissible under either approach, *id.* at 1188.[6] The court emphasized that a balancing test could not survive sixth amendment scrutiny unless it "begin[s] with a presumption against exclusion of otherwise admissible defense evidence." *Id.* *Fendler* listed the following factors: the importance of the witness, which was deemed the most significant factor, *id.;* the prejudice to the prosecution, *id.* at 1189; and the willfulness of the discovery violation, *id.* at 1190. *See United States ex rel. Robinson v. McGinnis,* 593 F.Supp. 175, 180 n. 3 (C.D.Ill.1984), *aff'd mem.,* 753 F.2d 1078 (7th Cir.), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985).

The Seventh Circuit explicitly adopted a balancing test in *Alicea v. Gagnon,* 675 F.2d 913 (7th Cir.1982), in which it considered the sixth amendment implications of precluding defendant's own alibi testimony. The court's primary concern was "the justification for the state interest," *id.*

6. The dissenting judge rejected *Davis* as inconsistent with the statement in *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973), that the right to confront

and cross-examine is not absolute. *Fendler, supra,* 728 F.2d at 1193 (Alarcon, J., dissenting). Judge Alarcon preferred adoption of a balancing test. *Id.*

at 923, i.e., the prejudice suffered by the prosecution, *id.* at 924. *Alicea* also considered the state's "interest in facilitating the orderly administration of justice," *id.*, which, it was held, should not "override the accused's right to tell his version of the story," *id.* The court added that the prosecution had the ability to cross-examine the defendant, *id.*, and, if the defendant's testimony significantly weakened the prosecution's case, to "seek a continuance for further investigation," *id.* The Seventh Circuit rejected *Rider v. Crouse*, 357 F.2d 317 (10th Cir.1966), which upheld the preclusion sanction, largely because that case preceded the relevant Supreme Court decisions. *Alicea, supra*, 675 F.2d at 924–25. The Seventh Circuit later stated its balancing test as follows:

> In addition to preventing surprise, other factors considered before a witness preclusion sanction is employed to enforce discovery rules are: the effectiveness of less severe sanctions, the materiality of the testimony to the outcome of the case, prejudice to the other party caused by the testimony, and the evidence of bad faith in the violation of the discovery rules.

*United States ex rel. Enoch v. Hartigan*, 768 F.2d 161, 163 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986).

This court agrees with the Seventh Circuit that a balancing test is appropriate. "An absolute prohibition of using the witness preclusion sanction to enforce notice of alibi rules is unnecessary. Such a prohibition could result in making trial courts powerless to prevent criminal defendants from concocting last minute alibis." *Braunskill v. Hilton*, 629 F.Supp. 511, 523 (D.N.J.1986). In addition to the factors listed in *Enoch, supra*, this court considers the extreme lateness of Escalera's notice that he intended to call his brother as an alibi witness. The timing of the notice bears on several of the *Enoch* factors: the effectiveness of less severe sanctions, prejudice to the prosecution, and bad faith by the defendant.

Starting with the proviso that there is a sixth amendment presumption against exclusion of otherwise admissible defense evidence, the court finds that the State has overcome the presumption on the facts of this case.

(1) The proffered testimony of Peter Escalera had to be a substantial surprise, coming, as it did, during the defense case.

(2) Sanctions less severe than preclusion would have been ineffective. A continuance could hardly deter violation of the alibi notice statute. *See* Comment, *Alibi Notice Rules: The Preclusion Sanction as Procedural Default*, 51 U.Chi.L.Rev. 254, 276 (1984). When the proffer was made, it was far too late to prohibit further discovery for Escalera. It is questionable whether the Constitution would permit the State to argue to the jury that a surprise alibi is unworthy of trust. *See id.* & n. 127. Nor does the court see much point to a contempt citation against the attorney who failed to provide notice, particularly because such a remedy would create a conflict between the attorney's desire to avoid punishment and the defendant's desire to hold on to his secret testimony as long as possible. *See id.* at 277.

(3) Peter Escalera's testimony might have been material to the outcome of the trial, since his testimony would have covered a time period that did not entirely overlap that to which Samuel Gonzalez testified. On the other hand, because the shooting took place at approximately 6:30 and Peter's testimony would have been that his brother had been home from 6:00 to 6:30, the proffered testimony was not as crucial as Gonzalez's. The jury could have believed that Robert Escalera was home until about 6:30 and then left to commit the crime. Additionally, it is quite likely that the jury would have discounted Peter Escalera's testimony as an attempt by the witness to save his brother from lengthy incarceration.

(4) By the time Escalera notified the court and the State that he intended to call his brother, the State had completed its case-in-chief. It is quite possible that, had

the State received timely pretrial notice, it would have interviewed Peter Escalera and proceeded differently with the investigation of the crime, let alone presentation of its case at trial. Although the prosecutor did not specifically discuss the prejudice to which the State would be subjected, a reference to the obvious potential for prejudice is implicit in the colloquy that attended the first notification that Escalera intended to call his brother. After defense counsel stated that he was willing to give the prosecutor ten or fifteen minutes to interview Peter Escalera and that this would not in any way jeopardize the State's case (T232–33), the prosecutor responded: "I am astounded by counsel's comment" (T233).

(5) Escalera's apparent bad faith—or, at least, the absence of a good excuse—is evident in the very lateness of the notice. Peter Escalera was not a recently discovered witness. The only reason advanced for the lateness of notice as to Peter was counsel's representation that he had previously intended to call his father as an alibi witness. But the father was not listed on the witness list, either. After counsel's initial application was denied, he stated that his original intention had been to avoid calling family members, who might have credibility problems (T292). Although counsel changed his mind well into the trial, his reason was no more than a change in strategy. This court does not deem that a good reason, particularly after the defendant had had an opportunity to assess the strength of the State's case. If Escalera had even pondered calling his father or brother, he ought to have given notice before trial. This would have preserved his right to call alibi witnesses and the State's right to be prepared for such testimony, without any commitment on Escalera's part to actually call the witnesses. Such a procedure would have given Escalera the option of changing his strategy during the course of trial without any prejudice to the State.

In light of the foregoing factors, this court determines that the trial judge's preclusion order did not violate the sixth amendment. Although it should be a rare case in which the preclusion sanction is permissible, this is such a case. Not only has the Supreme Court upheld the right of states to pass alibi notice statutes, it has approved rule 12.1(d) of the Federal Rules of Criminal Procedure, which permits preclusion of alibi testimony by witnesses other than the defendant, in the event of a failure to provide notice. The unmistakable implication is that the Court has refused to find a sixth amendment right to trial by ambush. Accordingly, this court rejects Escalera's first contention.[7]

### III. *Identification Testimony*

"Long cautious about the accuracy of eyewitness identifications, the Supreme Court has steadfastly stressed that the reliability of the identification is the 'linchpin in determining the admissibility of identification testimony.'" *Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir.1982) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977)). Unless there is "a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), however, identification testimony should not be suppressed; instead, "such evidence is for the jury to weigh," *Brathwaite, supra*, 432 U.S. at 116, 97 S.Ct. at 2254; *accord Dickerson, supra*, 692 F.2d at 244.

When law enforcement authorities obtain identification of a suspect through unduly suggestive procedures, the remedy is not an automatic exclusion of identification testimony. The Supreme Court has rejected a per se rule of exclusion because it would keep reliable and relevant evidence from the jury without deterring police misconduct, as well as have a deleterious impact on the administration of justice. *Brathwaite, supra*, 432 U.S. at 112, 97 S.Ct. at 2252. Thus, the "central question"

---

7. It should be emphasized that this opinion does not deal with a late notice that was given before the commencement of trial, or with a mere technical defect in notice, or with a defendant's right to testify on his own behalf.

becomes "whether under the 'totality of the circumstances' the identification was reliable even though the ... procedure was suggestive." *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

As suggested by the foregoing, a court considering the admissibility of identification testimony must ask two questions: (1) Were the circumstances surrounding the pretrial identification unduly suggestive of the suspect's guilt? (2) If so, balancing the suggestiveness of the identification procedures "against factors indicating that the in-court identification was independently reliable," is the testimony "clearly reliable, independent of improper procedures"? *Styers v. Smith,* 659 F.2d 293, 297 (2d Cir.1981). If the second question is reached,

> the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers, supra,* 409 U.S. at 199, 93 S.Ct. at 382. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253.

The list of factors in *Biggers* has not been viewed as exhaustive, because the Court stated that the factors "include" those enumerated, but did not state that these are the only factors. One court has held that "[a]nother factor affecting the reliability of an identification is the prior familiarity the witness has with the accused." *Minetos v. Scully,* 625 F.Supp. 815, 819 (S.D.N.Y.1986).

When all the relevant factors are weighed, the court must determine whether the prosecution has satisfied its burden of "establish[ing] by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the [unduly suggestive pretrial] identification," *United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967). Although the burden of proof at suppression hearings is generally no greater than proof by a preponderance of the evidence, *see United States v. Matlock,* 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974), the more strenuous clear-and-convincing standard is used in the *Wade* context because of the effect pretrial identification has in crystallizing future testimony, because it may be impossible to attack an unequivocal courtroom identification other than by raising the unfairness of suggestive pretrial identification, and because of the difficulty in determining whether in-court identification was based on independent recollection. *See Nix v. Williams,* 467 U.S. 431, 444–45 n. 5, 104 S.Ct. 2501, 2509–10 n. 5, 81 L.Ed.2d 377 (1984). Against this background, the court considers the admissibility of the testimony of Nieves and Torres identifying Escalera as the gunman.

### A. *Suggestiveness*

After the shooting of Jesus Cordero on August 18, 1975, Detective Harold Ruger showed an array of eight photographs to Nieves and Torres, separately, on September 3, but they were unable to make an identification (W25–26).[8] Twenty-five days later, on September 28, Detective Ruger showed Nieves and Torres ten photographs each. Again, Nieves and Torres were apart during the viewing, but this time Escalera's photograph was part of the array, and each witness identified him as the gunman (W28–29).[9]

---

**8.** Numerals preceded by "W" are references to the transcript of the *Wade* hearing. Although Detective Ruger initially testified that seven photographs were displayed on September 3, it later became clear that there were eight photographs on that date (W42).

**9.** Nieves, who testified in Spanish, and Torres did not recall the sequence and location of the photograph viewings in exactly the same way as Ruger. Indeed, Torres recalled viewing photographs at the precinct house, together with Nieves (W136–37). But the court credited Rug-

The state court held—and this court agrees—that the photographic displays were not unduly suggestive. At neither viewing was either witness in the presence of anyone other than Ruger. The twenty-five day interval between the two displays was adequate to guarantee that Nieves and Torres would not recall the first eight photographs they had seen. Therefore, they would not assume that the suspect had to be one of the two persons added in the second array. Nor is there any contention that the photographic arrays were designed to facilitate the identification of Escalera as opposed to anyone else. *Cf. Styers, supra,* 659 F.2d at 297 (witness shown small group of photographs, only two of which were fresh and in color, and asked by officer, "Are these the two fellows?").

With regard to the photographic arrays, the *Wade* inquiry is closed by the finding that the procedures used were not unduly suggestive. The police, however, did something else to try to firm up the identification of Escalera. After Nieves and Torres identified Escalera's photograph, Detective Ruger brought the suspect to the 77th Precinct, 13th Homicide office. He then brought Nieves and Torres to the office and told them "I would like them to look at someone" (W30). Ruger placed the witnesses together in a room, where they viewed Escalera through a one-way mirror (*id.*). Each identified Escalera as the gunman (W31).

■ The trial judge noted that this showup procedure was "highly irregular, highly improper" (W166). "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967) (footnote omitted); *accord Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969). The dangers

of suggestion are compounded when the witnesses view a showup together. *Cf. Wade, supra,* 388 U.S. at 234, 87 S.Ct. at 1936 (joint viewing of *lineup* fraught with dangers of suggestion); *id.* at 230 n. 13, 87 S.Ct. at 1934 n. 13 (use of one-way mirror impedes detection of suggestive influences). If "[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification," *Biggers, supra,* 409 U.S. at 198, 93 S.Ct. at 381, one would be hard pressed to conceive a procedure more suggestive than a showup where two witnesses view a single suspect through a one-way mirror. To reach the second stage of *Wade–Biggers–Brathwaite* analysis, it is not necessary to find that police procedures were "extraordinarily egregious; all that is required is sufficient suggestiveness in those procedures to justify looking to whatever countervailing indicators of reliability may exist." *Jarrett v. Headley,* 633 F.Supp. 1403, 1414 (S.D.N.Y. 1986) (citing *Dickerson, supra,* 692 F.2d at 248 n. 3 (Newman, J. concurring)). That a showup is extremely suggestive does not foreclose admissibility, because the court must apply the *Biggers* factors to determine the reliability of the identification testimony under the totality of the circumstances. *See, e.g., Hamele v. Manson,* 577 F.Supp. 439, 442 (D.Conn.1983), *aff'd mem.,* 738 F.2d 418 (2d Cir.1984).

### B. *Reliability*

■ While condemning the highly suggestive showup, the trial judge observed that photographic identification was made beforehand (W167–69). The judge also found that the identification testimony of both Nieves and Torres was supported by substantial indicia of reliability. He concluded:

> From the testimony, the Court finds that the witness Nieves had ample opportunity on August 18th, 1975 to view the

---

er's version, and this finding of a historical fact is entitled to the statutory presumption of correctness. 28 U.S.C. § 2254(d); *see Matusiak v. Kelly,* 786 F.2d 536, 543 (2d Cir.), *cert. dismissed,* —— U.S. ——, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986); *Dickerson, supra,* 692 F.2d at 242–

43; *see generally Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam) (ultimate question as to constitutionality of pretrial identification procedures is mixed question of law and fact not governed by section 2254(d)).

defendant; that he had ample opportunity to see the face of the defendant, who he testified fired the gun. The Court therefore concludes that the in-court identification made by Pasquale Nieves was based upon his own independent recollection, and was in no way influenced by the improper show-up at the police station and was in no way influenced by the exhibition of ten photographs, which the Court has viewed and which are received in evidence and which the Court finds that such exhibition of the photographs was not at all suggestive and did not influence the in-court identification made by the witness Nieves [W167].

As to Torres, the trial judge found that the witness had previously seen Escalera five, six, or seven times (W168), that the photographic arrays he saw were not unduly suggestive (W169), and that his in-court identification of Escalera was based upon his independent recollection (*id.*). The judge added that all the findings of fact he had made were established to his satisfaction beyond a reasonable doubt (*id.*), rather than merely by clear and convincing evidence, as required by *Wade*.

This court finds that the severity of the showup procedure's impropriety is largely mitigated by the prior identifications from non-suggestive photographic arrays. Obviously, circumstances would be different had the showup preceded the photographic exhibitions. *Cf. Wade, supra,* 388 U.S. at 229, 87 S.Ct. at 1933 (once witness picks accused out of lineup, he is not likely to go back on his word). Because the witnesses were made part of a suggestive procedure before trial, it remains necessary to apply the *Biggers* factors in order to determine the reliability of the in-court identification. *See United States v. Mills,* 704 F.2d 1553, 1563–64 (11th Cir.) (witness identified defendant first from photo array of all prison inmates and subsequently at one-on-one showup; given substantial independent basis for identification, in-court identification was admissible despite intervening suggestive procedures), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984).

### 1. Opportunity to View the Criminal at the Time of the Crime

The first *Biggers* factor clearly favors admissibility in this case. Both Nieves and Torres testified that they had seen the gunman for several minutes before the holdup began and both faced the gunman during the holdup. Moreover, the witnesses saw the gunman at close range during daylight hours.

### 2. The Witnesses' Degree of Attention

As victims of a holdup at gun and knifepoint, Nieves and Torres had every reason to be attentive. *See United States ex rel. Phipps v. Follette,* 428 F.2d 912, 915 (2d Cir.) (Friendly, J.) (person unaware crime is being committed—or even bystander who knew that one had been—has less desire than victim to seek out and retain image of perpetrator), *cert. denied,* 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); *accord Biggers, supra,* 409 U.S. at 200, 93 S.Ct. at 382.

### 3. Accuracy of Witnesses' Prior Descriptions of Criminal

Although Nieves and Torres were ambiguous in describing the gunman's race to the police—the gunman was alternatively described as black, black Hispanic, plain Hispanic, and having a sallow complexion—the ambiguities seem largely the product of semantic difficulties rather than an inability to describe the gunman. The witnesses consistently described the gunman as slight in stature, a teenager, with an Afro haircut, a moustache and no beard. Their descriptions of his clothing were essentially identical.

### 4. Level of Certainty Demonstrated by Witnesses at Confrontation

While the witnesses' certainty at the highly suggestive showup does not prove much—if anything—their independent selection of Escalera's photograph from a non-suggestive array, coupled with their failure to select a suspect from the prior array that excluded Escalera, shows a per-

suasive level of certainty. Both photographic arrays were viewed independently, and neither witness expressed any doubt upon seeing Escalera's photograph.

### 5. *Length of Time Between Crime and Confrontation*

The interval between the crime of August 18 and the photographic identification of September 28, while not insignificant, is not unduly long, either. If the other *Biggers* factors offered Escalera more support, the court would be disposed to find the six-week hiatus quite important. *See Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir.1978) (one-month interval deemed "considerable"). Because, however, the other factors militate in favor of admissibility, the court does not find the six-week interval greatly significant.

### 6. *Other Factors*

Torres' testimony that he had seen Escalera five to seven times before the incident is not entitled to a great deal of weight, because it took him some time to bring this to the attention of the police. Thus, even if Torres remembered Escalera from incidents preceding August 18, the memory was hardly indelible.

Far more significant is the timing of the suggestive showup. Because *Brathwaite* requires the court to balance the *Biggers* factors against the corrupting effect of the suggestive identification, *Brathwaite, supra*, 432 U.S. at 114, 97 S.Ct. at 2253, it is crucial that the showup *followed* an untainted photographic identification. In other words, the corrupting effect of the showup was, at best, minimal, because the showup merely confirmed the more difficult and impressive identification from the photographic arrays. Under all the circumstances, the trial judge was well within his authority to find that there was clear and convincing evidence that in-court identification of Escalera was based on observations other than the improper showup. Accordingly, Escalera is not entitled to habeas relief on the theory that his in-court identification was unconstitutional.

### IV. *Conclusion*

Because the court has rejected both grounds advanced by Escalera, his petition for habeas corpus is hereby dismissed. Notwithstanding the dismissal of the petition, the court determines that Escalera presented substantial questions that are worthy of appellate review. Therefore, in the event Escalera chooses to appeal this court's judgment, this paragraph shall constitute a certificate of probable cause within the meaning of rule 22(b) of the Federal Rules of Appellate Procedure.

SO ORDERED.