**Casim NOBLE, Petitioner,**

v.

**Walter R. KELLY, Superintendent, Respondent.**

No. 97 Civ. 6907(LBS).

United States District Court, S.D. New York.

Feb. 28, 2000.

The Legal Aid Society, Federal Defender Division, Appeals Bureau, Phillip L. Weinstein, New York City, for petitioner Casim Noble.

Stephen F. Lungen, District Attorney, Sullivan County, Bonnie M. Mitzner, Monticello, NY, for respondent Walter R. Kelly.

## OPINION

SAND, District Judge.

Casim Noble, a prisoner in state custody, petitions this Court for a writ of habeas corpus. After a thorough examination of the record, we conclude that the Petitioner's conviction was obtained in violation of his rights to present witnesses in his defense and to the effective assistance

of counsel, both of which are guaranteed by the Sixth Amendment. The petition is, therefore, granted.

### BACKGROUND

On October 26, 1989, at about 8:00 p.m., Dwight Usher, then 17 years old, was shot four times. Although the shooting was not fatal, the victim suffered severe injuries to his chest, groin, thigh, and elbow. After several operations and a week in the hospital, Usher recovered, though two bullets remain lodged in his body.

The shooting occurred outside a bar, called the Around the Corner Bar, in Kiamesha, New York. The Sullivan County Sheriff's Department conducted an investigation, and on January 24, 1990, a Grand Jury in that county returned a five-count indictment charging three individuals with various crimes in connection with the shooting. (*See* Indictment 38/90.) Those three individuals were the Petitioner, Derrick Pittman, and Rufus Middleton. (*Id.*) Each defendant was charged with attempted murder, first degree assault, and criminal use (two counts) and possession of a firearm. (*Id.*)

A jury trial commenced in New York State Supreme Court in Sullivan County (Kane, J.) on March 14, 1991. The trial centered around the conflicting testimony of four individuals who claimed to have been eyewitnesses to the shooting.[1] Two of those witnesses—Troy Leibert and the victim, Dwight Usher—testified for the prosecution. The other two witnesses— Melvin Walker and Raphalena Andrews— testified for the Petitioner.[2] Because of its centrality to our resolution of this petition,

---

1. The only physical evidence was presented by Detective Anthony Suarez of the Sullivan County Sheriff's office, who testified that he, along with his partner, Lieutenant Whalen, "recovered four spent cartridges" of 380 caliber from the scene. (*See* Trial Transcript ("Tr.") at 423.) No gun was ever found. (*See id.* at 493.) The detective also recovered the victim's coat, which had a bullet hole in it and was covered with blood. (*See id.* at 433–35.)

2. Because counsel for defendants Pittman and Middleton opposed the calling of both Walker and Andrews, those witnesses technically did not testify for those two defendants. (*See id.* at 586.) In fact, Pittman and Middleton argued that permitting Noble to call those witnesses, over their objection, required a severance. (*See id.* at 563– 573, 586). The trial court denied that application (*see id.* at 573), and the Appellate Division affirmed, *see People v. Middleton*, 192 A.D.2d 740, 741, 596 N.Y.S.2d 177, 178 (1993).

we summarize the eyewitness testimony in some detail.

## A. The Eyewitness Testimony

### 1. Leibert

The first eyewitness to testify was Troy Leibert. Leibert testified that throughout the summer of 1989, he and his cousin, Terence Duncan, had been making regular trips to the Sullivan County area from their homes in New York City. (*See id.* at 115.) Although Leibert denied any use of illegal drugs or involvement in drug trafficking, during cross-examination defense counsel elicited that he had once been convicted for possession of drug paraphernalia. (*See id.* at 186–87.) Leibert testified that on October 26, 1989, he traveled to Sullivan County by bus with Melvin Walker and with Walker's girlfriend, Raphalena Andrews. (*See id.* at 117–18.) Leibert was scheduled to appear in court that day in Sullivan County in connection with a trespassing charge. (*See id.*) When his court appearance was completed, Leibert, along with Walker and Andrews, took a taxicab to the Around the Corner Bar to meet up with Duncan, who they believed was inside. (*See id.* at 120.)

Leibert testified that upon their arrival at the bar, while standing about 30 to 35 feet away (*see id.* at 133), he saw Duncan's car parked outside and noticed that Dwight Usher was seated in the front passenger seat (*see id.* at 123–24). Leibert then saw "three guys come down" a nearby hill and approach the car. (*Id.* at 124–26.) One of them (later identified as Pittman (*see id.* at 135))[3] knocked on the window, prompting Usher to roll it down. (*See id.* at 126.) Words were exchanged and Usher eventually got out of the car. (*See id.* at 127.) While the argument continued, one of the three (later identified as Noble (*see id.* at 137)) "pulled out a gun

and . . . shot" Usher, (*id.*), after which all three ran back up the hill (*see id.* at 145). Leibert, Walker, and Andrews then ran into the bar and told the bartender to call an ambulance. (*See id.* at 148.) Without waiting for the ambulance to arrive, however, Leibert, Walker, and Duncan put Usher in the car and drove him to the Sheriff's Department headquarters. (*See id.* at 150–51.)

### 2. Usher

The second eyewitness to testify was the victim, Dwight Usher. Usher, who also resided in New York City, testified that he began making trips up to Sullivan County in September, 1989 to sell crack cocaine. (*See id.* at 221–24.) His territory was the Around the Corner Bar. (*See id.*) Usher explained that initially he worked selling crack for a friend, John Clairborn, but that, at some point, he met Terence Duncan. (*See id.* at 229–30.) Because Duncan offered him more money than Clairborn had been paying, Usher switched allegiances and began to sell crack for Duncan. (*Id.*)

Usher testified that on October 26, 1989, at around 7:45 p.m., he saw "a Black male standing on the hill next to the Around the Corner bar . . . ." (*Id.* at 237.) Although he had seen that person a few times and knew that his name was Rufus,[4] he had never met him. (*See id.* at 237–38.) Usher explained that because he had never met Rufus, he "confronted him and asked him why was he up here . . . ." (*Id.* at 237, 240–42.) Rufus responded that it was none of Usher's business and told him "to get out of his face." (*Id.* at 240.) Usher then went back to the bar, asked Duncan for the keys to his car, and waited in the front passenger seat of the car listening to music on the radio. (*See id.* at 242–43, 245.)

---

**3.** Leibert explained that, as of October 26, 1989, he had seen all three of the defendants before and was able, therefore, to recognize them. He had seen Middleton and Pittman in New York City and recognized Noble, having

seen him a few times in the Sullivan County area that summer. (*See id.* at 135–40.)

**4.** Usher subsequently identified that person to be Rufus Middleton. (*See id.* at 239.)

About two or three minutes later, he saw three males coming down the hill approaching the car (*See id.* at 244.) One of the three, later identified as the defendant Derrick Pittman (*see id.* at 246), asked him to get out of the car (*see id.* at 245). According to Usher, Pittman asked him why he had confronted Middleton (*see id.* at 247), then backed up (*see id.* at 249). "And," Usher concluded, "that's when ... [Noble] pulled out the gun and shot me." (*Id.*) As Usher fell to the ground, he saw his three assailants run up the hill. (*See id.* at 251.)

Usher also testified that he recalled Leibert, Duncan, and Walker putting him in the car and driving him to the sheriff's office. (*See id.* at 253.) He recalled a conversation with a "female sheriff" who asked him who had shot him. He remembered that he told her that "Casim and Rufus" had shot him. (*Id.* at 253–54.) The sheriff, Corporal Marilyn Cook, testified at the trial and corroborated Usher's account. (*See id.* at 369, 380.)

### 3. Walker

Melvin Walker, the third eyewitness, was called by the Petitioner. At the time of the trial, Walker was incarcerated on narcotics charges and pursuant to a conviction for attempted rape. On October 26, 1989, however, Walker resided in New York City. That day, he testified, he traveled to Sullivan County by car with Troy Leibert because Troy was scheduled to appear in court. (*See id.* at 600.) Walker testified that he had been inside the Around the Corner Bar that evening prior to the shooting. At one point, he went outside. (*Id.* at 607.) According to Walker, when he left the bar, Leibert, Andrews, Duncan, Noble and Pittman were all inside. (*See id.* at 609, 692.)[5]

Walker testified that, upon exiting the bar, he went across the street to a hotel to make a phone call. (*See id.*) On his way back to the bar a few minutes later, while standing only six or seven feet from Dun-

can's car, he saw Usher sitting in the car and saw "three people" talking to him. (*Id.*) Usher got out of the car and one of the three men shot him. (*See id.*) Walker testified that because it was dark (*id.* at 612) and because Usher's assailants had hoods pulled over their faces (*see id.* at 681), he could not identify them (*id.* at 608–09). However, Walker also testified that he knew Pittman (*see id.* at 646) and Middleton (*see id.* at 647) from New York, and recognized Noble from Sullivan County, and he was certain that those three individuals had not been involved. (*See id.* at 695–96.) Finally, Walker testified that he went to the sheriff's department with Usher, and later visited him at the hospital. At one point, while they were in the hospital, Walker testified that Usher asked him "who did it, who did it," and Walker responded that he didn't know. (*See id.* at 615.)

### 4. Andrews

The final eyewitness to testify was Walker's former fiancee, Raphalena Andrews. Andrews had not been identified as a witness in advance of trial. The District Attorney told the court that he had tried unsuccessfully to locate Andrews. (*See id.* at 439.) When Andrews testified, she explained that she was appearing in response to a telephone call she had received during the trial from the Petitioner's mother, who asked her to testify. (*See id.* at 762.)

Andrews claimed that, on the night in question, she was standing with Leibert, having just gotten out of a taxicab, when the shooting occurred. (*See id.* at 758.) Like Walker, Andrews testified that she could not see the shooter (*see id.* at 760) because it was dark (*see id.* at 769) and because he and his two companions were wearing hoods that covered their faces (*see id.* at 768). Moreover, Andrews testified, like Walker, that on the day of the shooting she was familiar enough with Middle-

---

**5.** Walker claimed that he did not see Middle- ton at all that day.

ton and Noble that she could recognize them and was certain that neither of them had been involved with the shooting. (*See id.* at 765.)

## B. The Alibi and Mistaken Identity Defenses

At trial, Noble and his co-defendants attempted to discredit Leibert's and Usher's testimony. Defense counsel suggested, on cross-examination, that Leibert's account was untrustworthy because of the distance he stood from the shooting (30–35 feet), the lack of lighting (*see id.* at 202), and the fact that the car would seem to have blocked his view of the action (*see id.* at 202–04). Usher's credibility was attacked by the fact that he had confessed to dealing crack, and by the existence of some inconsistencies between his trial testimony and his testimony before the Grand Jury.[6] Noble also tried to discredit Usher by calling Valerie Hoar, a nurse who was working in the emergency room that night, to testify. (*See id.* at 538–39.) Hoar testified that she overheard a conversation between Usher and Lieutenant Whalen (Suarez's partner) in which Whalen asked Usher if he knew who had shot him and Usher said that he did not. (*See id.* at 541.)

In addition to the foregoing challenges to the prosecution's evidence and the testimony of the two witnesses who claimed that Noble and his co-defendants had not been involved, Noble attempted to present two principal defenses at trial. He tried to establish that (1) he had been inside the bar when the shooting occurred; and (2) it was three different individuals—named Cat, Shaka, and Gary—who confronted and shot Usher and that he and his co-defendants had been mistakenly identified. Several of the witnesses provided circum-

stantial evidence of the misidentification theory. Usher testified that just prior to the confrontation with Rufus Middleton, he had been involved in a confrontation with Cat, Shaka, and Gary. (*See id.* at 283–84.) During that confrontation, according to Usher, Cat held him in a headlock and broke a gold chain he had been wearing around his neck. (*See id.* at 284, 294, 316–23, 327–29.) Walker also testified that he had witnessed, and even been involved in, the altercation. (*See id.* at 607.) Detective Suarez confirmed, on cross-examination, that he had been involved in drug investigations in the Sullivan County area and that he was familiar with the names Cat, Shaka, and Gary in that context. (*See id.* at 499.) Finally, Corporal Cook's notes, which she took during the initial investigation on the night of the shooting, included a notation which read "Saab 9,000—Cat." (*Id.* at 390, 393.)

The principal evidence, however, that Noble hoped to present on both his alibi and mis-identification theories was the testimony of Steven Yamagata. Defense counsel represented to the court that, if called, Yamagata would testify that "he was there that night and he saw the prior fight between Cat, Shaka, and Gary, and that he was inside the bar when he heard the shots . . . and Casim was playing [a] video game, and they both exited the bar together." (*See id.* at 554; *see also* Yamagata Aff.) The prosecution objected to both elements of Yamagata's testimony. With respect to the claim that Yamagata had been in the bar with Noble when the shooting occurred, the District Attorney argued that such testimony should be excluded because it constituted an alibi defense and the Petitioner had failed to respond to the People's demand for notice of an alibi.[7] (*See* Tr. at 554–56.) After giv-

---

**6.** Usher told the Grand Jury that he went to the bar on the night of the shooting with Liebert and Walker (*see id.* at 310), but testified at trial that he went there with Duncan. In addition, while Usher testified at trial that it was after the confrontation with Middleton that he asked Duncan for his car keys, he had

told the Grand Jury that he asked for Duncan's keys prior to the confrontation with Middleton. (*See id.* at 349.)

**7.** New York's alibi-notice statute, N.Y.Crim. Proc.L. § 250.20 (McKinney's 1993), provides that:

ing Petitioner's counsel· an opportunity to research the question and to present any relevant information, and after considering and rejecting an adjournment rather than exclusion, the court sustained the People's objection. (*See id.* at 573–74.) With respect to Yamagata's testimony about the altercation between Usher and Cat, Gary, and Shaka, the court initially decided to permit Yamagata to testify. (*See id.* at 575.) The court explained that it would not permit testimony from Yamagata as to "the reason for the confrontation" (*id.* at 580), but that because there had been "testimony that one of the individuals involved in this altercation was in fact in the area at the time of the commission of the crime," it would permit "the testimony with respect to the altercation." (*Id.* at 581.) Later, however, after additional argument, the court revised its ruling, reasoning that because Usher had testified about the altercation, the purpose of calling Yamagata to testify about the altercation was only to impeach Usher's testimony. (*See id.* at 593–94.) The court then excluded the testimony on the ground that it was a "collateral issue upon which a third-party witness cannot be called to impeach the testimony of a witness." (*Id.*) Consequently, Yamagata never testified.

## C. Procedural History

On March 21, 1991, after a little more than one hour of deliberation, the jury returned guilty verdicts for each defendant on each count of the Indictment.[8] The court entered a judgment of conviction against Noble on May 17, 1991 for attempted murder in the second degree, criminal use of a firearm in the first degree (two counts), and criminal possession of a weapon in the second degree. He was sentenced to a prison term of 12 ½ to 25 years. (See Answer at ¶ 4.) The Appellate Division affirmed the convictions. *See People v. Noble*, 209 A.D.2d 735, 618 N.Y.S.2d 123 (N.Y.App.Div.1994). With respect to the exclusion of Yamagata's alibi testimony, the court did not address the merits but affirmed on the ground that "[e]ven if [it] were to find that [the trial court] committed error when it precluded this testimony, ... such error would be harmless in view of the overwhelming evidence of guilt." *Id.* at 124. The Appellate Division also concluded that trial counsel's performance satisfied the constitutional standard, noting only that "simple disagreement with trial strategies and tactics does not prove ineffectiveness." *Id.* (citation omitted).

The Court of Appeals denied Petitioner's application for leave to appeal. *See People v. Noble*, 84 N.Y.2d 1036, 623 N.Y.S.2d 192, 647 N.E.2d 464 (N.Y.1995). Petitioner's application for federal habeas corpus relief was filed with this Court on July 22, 1997.

· 1. At any time, not more than twenty days after arraignment, the people may serve upon the defendant or his counsel, and file a copy thereof with the court, a demand that if the defendant intends to offer a trial defense that at the time of the commission of the crime charged he was somewhere other than the scene of the crime, and to call witnesses in support of such a defense, he must, within eight days of service of such demand, serve upon the people, and file a copy thereof with the court, a "notice of alibi," reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the names, the residential addresses, the places of employment and the addresses thereof of every such alibi witness upon whom he intends to rely.

. . . .

3. If at the trial the defendant calls such an alibi witness without having served the demanded notice of alibi, or if having secured such a notice he calls a witness not specified therein, the court may exclude any testimony of such witness relating to the alibi defense. The court may in its discretion receive such testimony, but before doing so, it must, upon application of the people, grant an adjournment not in excess of three days.

8. Because assault is a lesser included offense, *see* N.Y.Crim.Proc.L. § 1.20(37) (McKinney's 1993), of attempted murder, the jury was instructed not to consider that charge if they found the defendant guilty of attempted murder. (*See* Tr. at 968); N.Y.Crim.Proc.L. § 300.40 (McKinney's 1993).

The Court issued an order on September 17, 1997 directing the Petitioner to show cause why his application was not barred by the one-year statute of limitations prescribed by Title I of the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, codified at 28 U.S.C. §§ 2244, 2253–55. Noble responded with an affirmation asserting, among other things, that his petition was not time-barred because he delivered it to prison authorities to be mailed on April 22, 1997, within the one-year statute of limitations. Nevertheless, applying the standard that, at that time, governed in this circuit, we dismissed Noble's petition on the ground that his delay in seeking habeas corpus relief was unreasonable. *See Noble v. Kelly,* No. 97 Civ. 6907(LBS), 1998 WL 8992 (S.D.N.Y. Jan. 7, 1998). In *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998), the court altered the standard to be applied by district courts when reviewing the timeliness of habeas corpus petitions involving convictions that predate the enactment of the AEDPA by more than one year. The Court of Appeals, therefore, vacated our earlier dismissal of Noble's petition and remanded it to be reconsidered in light of its holding in *Ross v. Artuz. See Noble v. Kelly,* No. 98–2255 (2d Cir. Sep. 25, 1998).

On March 3, 1999, Noble filed the amended petition currently before the Court. The petition cites the exclusion of Yamagata's testimony, the failure of his lawyer to obtain the testimony of Lt. Whalen, and statements made to the jury by the prosecutor about drug gangs as the chief errors entitling him to relief. The Respondent's Answer argues that Noble has not exhausted state remedies with respect to some of those claims, and asserts that the exclusion of Yamagata's alibi testimony was harmless because it would have been duplicative of the testimony that Walker was permitted to provide.

After this Court appointed counsel to assist Mr. Noble in the presentation of his petition, counsel provided the court with a letter brief elaborating on the arguments raised in Noble's pro se petition. (*See* Letter from Weinstein to the Court of January 12, 2000.) The Respondent's reply merely re-iterated the contention that Walker gave "the same testimony" that Yamagata would have given. (*See* Letter from Mitzner to the Court of February 8, 2000.) As is set forth in more detail below, that claim is not supported by the record. Walker testified that Noble was in the bar *before* the shooting occurred; Yamagata would have testified that Noble was in the bar *when* the shooting occurred.

## DISCUSSION

### I. PROCEDURAL REQUIREMENTS

#### A. The Timeliness of the Petition

The AEDPA established a "1–year period of limitation," running from the date a conviction becomes final, for any "application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C.A. § 2244(d)(1) (West 1999). Defendants whose convictions became final more than one year prior to the enactment of the AEDPA had one year from the date of that statute's enactment, or until April 24, 1997, to file an application for habeas corpus relief. *See Ross v. Artuz,* 150 F.3d 97, 102 (2d Cir.1998). Casim Noble's convictions became final on January 30, 1995 when the New York Court of Appeals denied him leave to appeal. *See People v. Noble,* 84 N.Y.2d 1036, 623 N.Y.S.2d 192, 647 N.E.2d 464 (N.Y.1995). Accordingly, the AEDPA requires him to have filed his petition on or before April 24, 1997.

■ As a general rule, a petition for habeas corpus is deemed filed for statute of limitations purposes when it is received by the clerk of the district court. *See* Rule 3, Rules Governing Section 2254 Cases. Because Mr. Noble's petition for habeas corpus was not received by the clerk of the district court until July 22, 1997, it would seem at first glance that his petition is time-barred. A prison inmate proceeding pro se, however, faces "unique" obstacles

when attempting to comply with filing deadlines. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). In particular, the inmate "cannot take the steps other litigants can take to monitor the processing . . ." of his filings. *Id.* "[P]ro se prisoners cannot personally travel to the courthouse to . . ." ensure that their papers are filed, and while other litigants may choose to rely on the postal service, "the pro se prisoner is forced to do so by his situation." *Id.* at 271, 108 S.Ct. 2379.

Recognizing those disadvantages, the Supreme Court has held that a prison inmate proceeding pro se satisfies the 30–day time limit provided by the Federal Rules of Appellate Procedure if he delivers his notice of appeal to prison officials within the thirty-day limit, even if it is not filed with the clerk of the court until after the time limit has expired. *See Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988).[9] One threshold question presented by Mr. Noble's petition is whether a similar "prison mailbox" rule should be applied to an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

In answering that question, we begin by noting that many federal courts have drawn upon the Supreme Court's reasoning in *Houston v. Lack,* and extended its holding to establish prison mailbox rules for the filing of other types of court papers. *See, e.g., Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (FTCA administrative filing); *McGore v. Wrigglesworth,* 114 F.3d 601, 605 (6th Cir.1997) (motion for extension of time to correct deficiencies in application to proceed in forma pauperis); *Dory v. Ryan,* 999 F.2d 679 (2d Cir. 1993) (civil complaint); *In re Flanagan,* 999 F.2d 753 (3d Cir.1993) (appeal from bankruptcy court's final order); *Faile v.*

*Upjohn Co.,* 988 F.2d 985, 988 (9th Cir. 1993) (service of discovery responses); *Lewis v. Richmond City Police Dep't.,* 947 F.2d 733 (4th Cir.1991) (per curiam) (civil complaint); *Smith v. Evans,* 853 F.2d 155 (3d Cir.1988) (Rule 59 motion for reconsideration); *Marinez v. United States,* No. 89 Cr. 701 (DC), 1996 WL 51201 (S.D.N.Y. Feb. 8, 1996) (Rule 33 motion for new trial); *Cabrera v. United States,* No. 94 Civ. 4642(MGC), 1995 WL 479358 (S.D.N.Y. Aug.11, 1995) (Rule 33 motion for new trial), *aff'd,* 112 F.3d 503 (2d Cir. 1996).[10] In each of those cases, the court examined the circumstances surrounding the filing deadline at issue and tried to determine whether the concerns expressed by the Supreme Court in *Houston v. Lack* were present.

In this case, then, we must examine whether the *Houston* Court's concerns are present in the context of an inmate filing an application for habeas corpus relief. In one important sense, they are not. The Court in *Houston* was primarily concerned with the relative obstacles facing prison inmates as compared to non-incarcerated litigants. *See Houston,* 487 U.S. at 270–71, 108 S.Ct. 2379. In § 2254 actions, however, all litigants are prison inmates. In fact, being an inmate is a statutory prerequisite to filing. *See* 28 U.S.C. § 2254(a) (authorizing federal courts to entertain application for a writ of habeas corpus "in behalf of a person in custody"). The drafters of the Rules Governing Section 2254 actions were obviously aware of this fact and may be assumed to have drafted Rule 3's filing requirements with the custodial status of petitioners in mind. A petitioner's custodial status, however, is only one element of the disadvantage recognized by the Court in *Houston.* The other aspect is the lack of representation

---

**9.** The Federal Rules of Appellate Procedure have codified this holding in Rule 4(c)(1), which provides that an inmate's notice of appeal is timely filed "if it is deposited in the institution's internal mail system on or before the last day for filing." Fed.R.App.P 4(c)(1).

**10.** *But see Coleman v. Johnson,* 184 F.3d 398 (5th Cir.1999) (declining to establish prison mailbox rule for filing of application for state post-conviction remedies).

by counsel. That disadvantage is not shared by all applicants for a writ of habeas corpus. *See* 28 U.S.C. § 2254(a) (authorizing federal courts to entertain applications for writs of habeas corpus *"in behalf of* a person in custody.") (emphasis added). Although Noble is, at this time, represented by counsel (by virtue of this Court's appointment of counsel for this proceeding), when he originally filed his petition he was proceeding pro se. The *Houston* Court's concerns with the relative disadvantages facing inmates proceeding pro se remains, therefore, a compelling concern in this context.

On at least one occasion, the Supreme Court has rejected the use of a prison mailbox rule. *See Fex v. Michigan,* 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993). The Interstate Agreement on Detainers ("IAD") permits inmates in one jurisdiction who are facing prosecution in another jurisdiction to demand resolution of any pending indictment, information, or complaint in that other jurisdiction within 180 days by sending written notice of his incarceration to prosecuting officials. In *Fex v. Michigan,* 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993), the Court held that this 180-day period runs from the time the prosecuting official receives the notice rather than from the time the inmate delivers his notice to prison officials to be mailed. The Court based its reasoning on a careful exegesis of the IAD's text, which specified that the 180-day period began "after [the inmate] shall have caused [notice] to be delivered ..." to prosecuting authorities. To the Supreme Court, it was apparent that the "cause to be delivered" language referred to the receipt of the document. Recognizing the Supreme Court's emphasis on interpretation of the statutory text, the Court of Appeals recently explained that the *Fex* opinion signifies that "Houston does not apply ... when there is a specific statutory regime to the contrary." *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 n. 1 (2d Cir.1999).

Although the AEDPA appears to be a "specific statutory regime," we do not find that it is contrary to the application of a prison mailbox rule for § 2254 cases. To begin with, the AEDPA itself is silent with respect to when an application is filed for statute of limitations purposes. The prevailing rule comes from the Rules Governing Section 2254 cases, which predates the enactment of the AEDPA's time limit. Moreover, the specific language used in that rule is quite different from the statutory language that was so persuasive to the Court in *Fex.* The IAD formulated the statute of limitations in terms of "causing to be delivered;" Rule 3 simply states that a petition "shall be filed with the clerk of the district court." Rule 3's formulation, moreover, is virtually identical to the language at issue in *Houston* itself. *See* Fed. R.App.P. 4(a)(1) ("the notice of appeal ... must be filed with the district clerk . . . ."). We understand, of course, that the purpose of the AEDPA was generally to expedite the filing of habeas corpus petitions, but we are unable to conclude that Congress did so by silently amending Rule 3 of the Rules Governing Section 2254 Cases to prohibit the operation of a prison mailbox rule.

We conclude, therefore, that the prison mailbox rule should apply to petitions filed by pro se inmates seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. *Accord Jones v. Bertrand,* 171 F.3d 499, 502 (7th Cir.1999); *Miles v. Prunty,* 187 F.3d 1104 (9th Cir.1999); *Nichols v. Bowersox,* 172 F.3d 1068, 1073–77 (8th Cir.1999) (en banc); *Spotville v. Cain,* 149 F.3d 374, 378 (5th Cir.1998); *Burns v. Morton,* 134 F.3d 109, 113 (3d Cir.1998); *Hoggro v. Boone,* 150 F.3d 1223, 1226 n. 3 (10th Cir.1998); *In re Sims,* 111 F.3d 45, 47 (6th Cir.1997); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998); *Hoyer v. Senkowski,* No. 97 Cv 674, 1998 WL 357339 (N.D.N.Y. May 22, 1998). Mr. Noble's application will therefore be considered timely if it can be shown that he delivered it to prison authorities on or before April 24, 1997.

The question of which party bears the burden of proof on this question remains

open in this circuit. *See Covington v. Di-Biase,* 1999 WL 48775, at *1 n. 1, 172 F.3d 37 (2d Cir.1999).[11] We need not reach that question in this case, however, because Petitioner has provided sufficient evidence that he submitted his application to prison authorities on April 22, 1997, and the Respondent has not challenged that fact. In an affirmation filed with the Court, Mr. Noble indicates that his application for habeas corpus "was placed in the hands of the company C.O. for signature by the Hall Captain and transfer to Facility Business Office on April 22, 1997." (Pet. Aff. at 3.)[12] The affirmation also states that the "disbursement form" confirms this date, *id.,* and the copy of the disbursement form that was attached reflects that Noble submitted it on April 22, 1997. In addition, the Court notes that the original petition was signed by Mr. Noble on January 15, 1997, and finds that this fact corroborates Mr. Noble's contention that it was delivered to prison authorities prior to April 24, 1997. *See Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) ("Absent evidence to the contrary, the Court assumes that Torres gave his petition to prison official for mailing on the date he signed it....") (citing *Hunter v. Kuhlman,* 97 Civ. 4692, 1998 WL 182441, at *1 n. 2 (S.D.N.Y. April 17, 1998); *Hughes v. Irvin,* 967 F.Supp. 775, 778 (E.D.N.Y.1997); *Jones v. Artuz,* No. CV 97–2394, 1997 WL 876735, at *1 (E.D.N.Y. Sept. 13, 1997)); *Cabrera v. United States,* No. 94 Civ. 4642, 1995 WL 479358, at *1 n. 1 (S.D.N.Y. Aug. 11, 1995). For these reasons, the Court finds that Mr. Noble submitted his application to prison authorities to be mailed on April 22, 1997. It is, therefore, timely.

**B. The Exhaustion Requirement**

██ A federal court may not grant habeas corpus relief to a person in custody pursuant to a judgment of a State court unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). This requirement, which is grounded in principles of "federalism, comity, and judicial economy," *Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), requires a petitioner to raise all of his claims in the highest state court available prior to presenting them to a federal court as part of a petition for a writ of habeas corpus. *See Tyson v. Keane,* 159 F.3d 732, 735 (2d Cir.1998), *cert. denied sub. nom. Tyson v. Greiner,* 526 U.S. 1027, 119 S.Ct. 1270, 143 L.Ed.2d 365 (1999).

Although Respondent disputes exhaustion (*see* Answer at ¶ 15), he does not explain his reasoning. In any event, it is apparent from the Appellate Division's opinion affirming the conviction that the claims presented in Noble's amended petition are virtually identical to the claims presented to the state court, including the claims presented in Noble's supplemental brief to the Appellate Division. *See Daye v. Attorney General,* 696 F.2d 186, 192 (2d Cir.1982) (en banc) (holding that claims are exhausted when substance of petitioner's claims on direct appeal is same as substance in petition, even if phrased differently). Because the Court of Appeals denied Mr. Noble leave to appeal the Appellate Division's ruling, his claim reached the highest state court for exhaustion purposes. *See Williams v. Smith,* 591 F.2d 169, 171 (2d Cir.1979) (holding that state remedies were exhausted after decision by the Appellate Division and denial of leave to appeal by the Court of Appeals); *Ramirez v. Headley,* 98 Civ. 2603(RWS), 1998 WL 788782, at *4 (S.D.N.Y. Nov. 10,

---

**11.** For an extended analysis of the burden of proof issue in this context, see *Thomas v. Gish,* 64 F.3d 323, 324–25 (7th Cir.1995).

**12.** *See Robinson v. P.O. Nicole Matos et al.,* No. 97 Civ. 7144(TPG), 1999 WL 225938, at

*3 (S.D.N.Y. April 19, 1999) (finding that complaint was filed when delivered to prison authorities when only evidence was plaintiff's own statement).

1998). The Court finds, therefore, that Mr. Noble has exhausted state remedies with respect to all of his claims.

## II. EXCLUSION OF ALIBI TESTIMONY

### A. Legal Standard

■ The Sixth Amendment to the Federal Constitution guarantees every criminal defendant "the right ... to have compulsory process for obtaining witnesses in his favor...." U.S. Const. amend. VI. Although some have suggested that the Compulsory Process Clause only guarantees the power to subpoena witnesses, *see Taylor v. Illinois,* 484 U.S. 400, 407–08 nn. 10–12, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), the Supreme Court of the United States has consistently held that such a right would be meaningless unless it were also interpreted as a right to present those witnesses at trial. *See Michigan v. Lucas,* 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991); *Taylor,* 484 U.S. at 407–08, 108 S.Ct. 646 ("Our cases establish at a minimum, that criminal defendants have ... the right to put before a jury evidence that might influence the determination of guilt.") (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). The right to present exculpatory testimony is central to the concept of an adversary system, *see Taylor,* 484 U.S. at 408–09, 108 S.Ct. 646 (citing *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)), and is "a fundamental element of due process of law," *id.* at 409, 108 S.Ct. 646 (citing *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). *See also Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense").

■ Of course, the accused's right to present witnesses in his defense is not without limits. For example, a court may limit the presentation of evidence if it is concerned about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Similarly, it is consistent with the Compulsory Process Clause for the states to enact discovery or evidentiary rules that limit a defendant's opportunities to prevent favorable testimony. *See Lucas,* 500 U.S. at 149–151, 111 S.Ct. 1743 (rape shield statute); *Rock v. Arkansas,* 483 U.S. 44, 55–56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (citing *Chambers,* 410 U.S. at 295, 93 S.Ct. 1038). Alibi-notice statutes, such as the one at issue here, have been reviewed by the Court on two occasions and found to be constitutional each time. *See Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (describing a similar statute as "a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system"); *Williams v. Florida,* 399 U.S. 78, 90, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (an alibi-notice statute "by itself in no way affected [the defendant's] crucial decision to call alibi witnesses.... At most, the rule only compelled the defendant to accelerate the timing of his disclosure....").

In *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), the Supreme Court addressed the constitutionality of excluding exculpatory evidence as a sanction for violating a discovery rule, by articulating a balance between the state's need to control the evidence presented at trial and an accused's right to present a defense. The Court premised its reasoning on the proposition that the essential purpose of the Compulsory Process Clause is to ensure that judgments are not "founded on a partial or speculative presentation of the facts." *Id.* at 411, 108 S.Ct. 646 (quoting *Nixon,* 418 U.S. at 709, 94 S.Ct. 3090). As the court explained, however,

[t]h[at] principle ... is also the source of essential limitations on the right. The

adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. The trial process would be a shambles if either party had an absolute right to control the time and content of his witness' testimony

*Id.* at 410–11, 108 S.Ct. 646. Discovery procedures, like an alibi-notice statute, "minimize[ ] the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony." *Id.* at 411–12, 108 S.Ct. 646; *see also id.* at 412, 108 S.Ct. 646 (noting state's need to protect itself from "an eleventh-hour defense").

■ Trial courts, therefore, should administer and enforce those discovery procedures in light of the principle that the ultimate goal of the adversary process is to provide the triers of fact with evidence that is as thorough and complete as possible. "A trial judge," therefore, "may ... insist on an explanation for a party's failure to comply with ..." a discovery rule. *See id.* at 415, 108 S.Ct. 646.

If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process clause simply to exclude the witness' testimony.

*Id.* (citing *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)). A defendant may not invoke the Compulsory Process Clause in a manner that undermines the effectiveness of the adversary system as a means of discovering the truth. But if no such reason is found, then the extreme sanction of exclu-

sion may be inappropriate and an alternative sanction should be considered. *See id.* at 413–14, 108 S.Ct. 646.

In *Escalera v. Coombe*, 826 F.2d 185 (2d Cir.1987), which was decided before *Taylor*, the court reversed a denial of a petition for habeas corpus on the ground that, in the particular circumstances of that case, it was unconstitutional for the state trial court to preclude the testimony of a proffered alibi witness because of counsel's failure to file notice of an alibi. The court noted that "Escalera's counsel offered the court no reasonable explanation for [his] failure" to comply with the statute, *id.* at 188, but nevertheless found that the tremendous importance of the profferred alibi outweighed that concern. *See id.* at 191–92. "There simply is nothing more material to Escalera's guilt or innocence than evidence of his whereabouts during the thirty minutes immediately preceding the crime." *Id.* Applying the balancing test which then prevailed, *see Ronson v. Comm'r of Correction of New York*, 604 F.2d 176, 178–79 (2d Cir.1979) (applying balancing test in context of notice of insanity defense statute); *cf. Walker v. Hood*, 679 F.Supp. 372, 380–81 (S.D.N.Y.1988),[13] the court concluded that "[p]reclusion of an important defense witness solely as a sanction for failure to comply with New York's alibi notice statute was constitutionally impermissible absent a demonstration of substantial prejudice to the prosecution's case." *Id.* at 194.

Upon the state's petition for a writ of certiorari, the Supreme Court vacated *Escalera* and remanded for reconsideration in light of its intervening decision in *Taylor. See Coombe v. Escalera*, 484 U.S. 1054, 108 S.Ct. 1004, 98 L.Ed.2d 971 (1988); *Escalera v. Coombe*, 852 F.2d 45, 45 (2d Cir.1988) (per curiam). On remand, the court, applying *Taylor*, focused on whether defense counsel's failure to file an alibi notice occurred in circumstances that

---

13. *See also Alicea v. Gagnon*, 675 F.2d 913, 917–925 (7th Cir.1982) (analyzing permissibility of exclusion of defendant's alibi testimo-

ny pursuant to Wisconsin's alibi-notice statute).

might frustrate the integrity of the adversary process. The court noted that although the district court had referred to defense counsel's "apparent bad faith—or, at least, the absence of a good excuse," that finding was an insufficient basis for preclusion. *Escalera,* 852 F.2d at 48 (citing *Escalera v. Coombe,* 652 F.Supp. 1316, 1324 (E.D.N.Y.1987)). "The absence of a good excuse," the court reasoned, "is not necessarily commensurate with 'willful' conduct and it is not readily clear whether Escalera's attorney was, in fact, motivated by a desire to obtain a tactical advantage." *Id.* Therefore, the court remanded the case to the district court for an evidentiary hearing "as to whether or not the failure of Escalera's counsel to list ... a potential alibi witness meets the standards enunciated in *Taylor* ...." *Id; see also United States v. Levy–Cordero,* 67 F.3d 1002, 1015 (1st Cir.1995) (remanding to district court for evidentiary hearing as to whether defense counsel's failure to comply with federal alibi notice requirements was willful); *Poo v. Hood,* No. 89 Civ. 7574(MBM), 1991 WL 60389, at *2 (S.D.N.Y. April 12, 1991) (ordering evidentiary hearing to determine whether defense counsel's failure to comply with New York's alibi-notice statute was willful, as articulated in *Taylor*).[14]

**B.  Application to Yamagata's Testimony**

When defense counsel offered to call Mr. Yamagata during trial, and proffered that Yamagata would testify that he was inside the bar with Noble when the shooting occurred, the trial court, appropriately, inquired as to the reason that defense counsel had failed to provide notice of an alibi defense. Noble's counsel responded that he did not file an alibi notice because he did not believe that the testimony being offered constituted an alibi. He argued that, for purposes of compliance with the alibi notice statute, the Indictment defined

the scene of the crime and that the Indictment in this case alleged crimes occurring "in the vicinity of the Around the Corner Bar," which would, presumably, include the bar's interior. (*See* Tr. at 555.) Defense counsel also maintained that Yamagata's testimony would not constitute an alibi because, even if the crime scene was the front of the bar, the proffered testimony only placed the defendant a short distance away. (*See id.* at 554.)

The trial court rejected both of defense counsel's arguments. The court noted that the District Attorney had served Noble's counsel with an alibi demand on April 16, 1990—almost a full year prior to the commencement of the trial. The demand called for a response if the defendant intended "to offer a trial defense that at the time of the commission of the crime(s) charged you were at some place or places other than the scene of the crime...." (Alibi Demand) A discovery response provided by the prosecution on the very same day identified the "place ... of the alleged occurrence" to be the area "in front of the Around the Corner Bar...." (Response to Court's 20 Day Order at ¶ 1.) According to the court, it was this discovery response rather than the Indictment that defined the scene of the crime for purposes of applying the alibi notice statute. (*See* Tr. at 574.) Moreover, the court rejected defense counsel's other argument—that the term "alibi" is limited to those defenses placing the defendant far from the crime scene—reasoning that an alibi correctly describes any defense in which the defendant is anywhere other than the crime scene, even someplace quite nearby. (*See id.*)

■ We are not concerned here with whether those two rulings were correct; they are matters of state law and would not, even if erroneous, permit this Court to

---

**14.** After an evidentiary hearing, the court concluded that preclusion was inappropriate because defense counsel's failure was not willful. *See Poo v. Hood,* No. 89 Civ. 7874, 1992 WL 30617, at *4 (S.D.N.Y. Feb. 12, 1992). Nevertheless, the court concluded that the error was harmless in light of the negligible "potency" of the excluded testimony and therefore denied relief. *Id.* at *5.

grant habeas corpus relief. *See Lewis v. Jeffers,* 497 U.S. 764, 765, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) ("[F]ederal habeas corpus does not lie for errors of state law."). Our inquiry relates to whether preclusion of Yamagata's testimony was an appropriate sanction for counsel's failure to file a notice of an alibi defense, assuming that he was, in fact, required to do so, or was violative of Petitioner's Sixth Amendment rights. Our review of the record discloses that the court excluded Yamagata's testimony without ever finding that counsel's failure to file the requisite notice was willful or otherwise motivated by a desire for tactical advantage. The court stated that it did not find an "acceptable reason" (*see* Tr. at 574), but, as the Second Circuit has observed, "[t]he absence of a good excuse is not necessarily commensurate with 'willful' conduct...." *Escalera,* 852 F.2d at 48. Far from being willful or tactical, defense counsel's failure to file the notice appears to have been motivated by a genuine, albeit apparently erroneous, belief that Yamagata's testimony was not an alibi. The record reveals no inquiry as to whether defense counsel's position was taken in bad faith, nor does it disclose any reason that the trial court might have so believed. We are mindful, of course, that the Supreme Court did not intend for *Taylor*'s focus on willful violation of discovery procedures to serve as an exclusive test as to the conditions under which preclusion is appropriate. *See Taylor,* 414 ("[I]t is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case."). But where, as is the case here, the record discloses no indication that the trial court ever considered whether defense counsel's failure to comply with the notice requirement was designed to frustrate the truth-seeking function of the trial, we conclude that the court's exclusion of the alibi evidence violated the defendant's rights under the Compulsory Process Clause.

Our conclusion is reinforced by the minimal degree of prejudice that an alternative sanction would have caused the prosecution. In the course of the investigation that followed immediately after the shooting, the sheriff's department secured the bar and interviewed many of the patrons who had been inside. (*See* Tr. at 407–08.) Unlike the typical alibi defense, therefore, in which the defendant claims to have been at some distant, unknown locale, the prosecution in this case had a wealth of evidence about the place where the defendant claimed to have been and about the other witnesses who might contradict that testimony. Moreover, Yamagata was in custody at the time he was proffered as a witness. The prosecution surely possessed information about him, therefore, which it might have used to impeach his testimony. Finally, it should be noted that Yamagata was proffered as a witness after the close of the prosecution's case; no prosecution witnesses would have been inconvenienced by a brief delay. Had the trial court permitted Mr. Yamagata to testify, but granted the prosecution additional time to prepare a cross-examination or to adduce rebuttal testimony, the record from which the jury would be asked to render a verdict would have been more complete and accurate, not less. In such circumstances, we conclude that the trial court's decision to exclude the testimony, in the absence of any finding of bad faith or willful misconduct, violated Noble's rights under the Compulsory Process Clause of the Sixth Amendment. *Cf. State v. Harris,* 132 Idaho 843, 979 P.2d 1201, 1205 (1999) (applying *Taylor,* and concluding that exclusion of exculpatory testimony to be unconstitutional when court never inquired into prejudice caused to prosecution).

C.  Harmless Error

Although it was the principal issue raised on direct appeal, the Appellate Division did not reach the question of whether the trial court correctly applied state or federal law in precluing Mr. Yamagata's testimony. The court reasoned that

"[e]ven if [it] were to find that [the trial court] committed error when it precluded this testimony ... such error would be harmless in view of the overwhelming evidence of guilt." *People v. Noble*, 209 A.D.2d 735, 618 N.Y.S.2d 123, 124 (N.Y.App.Div.1994) (citations omitted). In so ruling, the court seems to have applied New York's harmless error standard for non-constitutional errors. *See People v. Crimmins*, 36 N.Y.2d 230, 367 N.Y.S.2d 213, 326 N.E.2d 787, 791–94 (1975). Although "verbalization" of that standard as it has been applied over the years "cannot be nicely harmonized," *id.* at 792, one of its distinguishing characteristics is that it permits a reviewing court to find an error harmless if it finds "overwhelming proof of the defendant's guilt," *id.* at 793–94.

◼ By contrast, when a state court reviews a conviction on direct appeal in which a federal constitutional error is established, the court must "be able to declare a belief that [the trial court's error was] harmless beyond a reasonable doubt," *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in order to find the error harmless. The *Chapman* standard provides that an "error is not harmless ... if 'there is a reasonable possibility that the ... [error] might have contributed to the conviction,'" no matter how "overwhelming may be the quantum and nature of other proof." *Crimmins*, 367 N.Y.S.2d 213, 326 N.E.2d at 794 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Fahy v. Connecticut*, 375 U.S. 85, 86, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). Because the Appellate Division failed to consider the causal effect of Yamagata's exclusion on the jury's verdict, focusing instead on its assessment that the evidence of guilt was overwhelming, it clearly applied an incorrect standard. We are not bound, therefore, by the Appellate Division's conclusion

that any error that occurred here was harmless.

◼ Nevertheless, to grant habeas corpus relief, this Court must also decide whether the trial court's error and the Appellate Division's affirmance thereof were harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). But because this case comes to us on collateral review, rather than direct review, we do not apply the *Chapman* harmless error standard even though the error is constitutional in nature. *See id.* at 638, 113 S.Ct. 1710.[15] To find the error harmless, for habeas purposes, we must determine that it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. 1239 ("If ... the [court's] conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and judgment should stand..... But if one cannot say, with fair assurance, ... that the judgment was not substantially swayed by the error," then it is harmful.) If, when all is said and done, we are in grave doubt as to whether or not the exclusion of Yamagata's testimony had such an effect, we must find the error harmful and grant relief. *See O'Neal v. McAninch*, 513 U.S. 432, 440, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

◼ We are persuaded, from a thorough examination of the record in this case, that the exclusion of Yamagata's testimony did have a substantial and injurious effect in determining the jury's verdict. The Respondent claims that the exclusion of Yamagata's alibi testimony was harmless because Melvin Walker offered the

---

**15.** Because the exclusion of Yamagata occurred "during the presentation of the case to the jury" and "may ... be quantitatively assessed in the context of other evidence presented ...," it is a "trial error" subject to harmless error review rather than a structural error requiring immediate reversal. *Brecht*, 507 U.S. at 629–30, 113 S.Ct. 1710; *see Wray v. Johnson*, 202 F.3d 515, 524–25 (2d Cir. 2000).

same testimony. However, as the trial court itself noted during trial (*see* Tr. at 611), Melvin Walker testified that Mr. Noble was inside the bar *before* the shooting occurred, but never testified that Mr. Noble was in the bar *when* the shooting occurred. (*See id.* at 607–09, 693.)

We note as well that the District Attorney successfully impeached Walker's testimony on cross-examination by revealing that Walker had previously identified Noble as the shooter. *Id.* at 711.[16] The only other defense witness who claimed that Noble had not been the shooter, Andrews, was similarly impeached by the fact that she had made a statement on the night of the shooting identifying Noble as the shooter. Although both Andrews and Walker had explanations for that crucial inconsistency,[17] Yamagata's testimony, as far as the record discloses, could not have been similarly discredited.

Walker's testimony does not, therefore, render the exclusion of Yamagata's alibi testimony harmless. Petitioner's trial focused, almost exclusively, on conflicting identification testimony; we cannot conclude, as we must to find the error harmless, that Yamagata's exclusion did not have a substantial and injurious effect on the jury's verdict. Particularly in light of the inconsistencies and other problems with Liebert's and Usher's testimony and the total lack of any physical evidence,[18] a potential alibi might very well have altered the outcome of the trial. The exclusion of that witness was not harmless.

### D. Standard for Granting Habeas Corpus Relief

When the claims presented in an application for habeas corpus relief have been fully presented to the highest state court, a federal court may only grant the application if the State court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1) (West 1999). Interpretation of that convoluted language has engendered a pronounced split among the federal circuit courts, *see Leka v. Portuondo,* 76 F.Supp.2d 258, 268 n. 21 (E.D.N.Y.1999) (summarizing in detail the positions of the different circuits), as to which the Second Circuit has, to date, remained silent, *see Smalls v. Batista,* 191 F.3d 272, 278 n. 5 (1999).[19]

**16.** The District Attorney also demonstrated that Walker's testimony was inconsistent with the little physical evidence that was available. For example, Walker testified that the windows of Duncan's car were tinted (*see id.* at 663, 113 S.Ct. 1710), which was, apparently contradicted by Detective Suarez's testimony and by the photographs of the car that were admitted into evidence (*see id.* at 689–90, 113 S.Ct. 1710). Also, Walker told the sheriff's department that he had never been to the Around the Corner Bar prior to the night of Usher's shooting (*see id.* at 631, 113 S.Ct. 1710) and that he came up with Leibert and Andrews on a bus (*see id.* at 704, 113 S.Ct. 1710) rather than by car, both of which contradicted his trial testimony. Finally, the District Attorney also discredited Walker by suggesting a possible bias due to the fact that the same District Attorney was responsible for prosecuting Walker.

**17.** Walker claimed that (1) the statement was typed by someone else and did not accurately reflect what he told the officers (*see id.* at 698–99, 748–49, 753–54); (2) that when he made the statement he was tired and wanted to leave and therefore told the officers what they wanted to hear (*see id.* at 750), and (3) that he intentionally implicated Noble in the shooting because he was in competition with Noble for drug sales and wanted to put Noble out of business (*see id.* at 747). The only explanation Andrews offered for her prior inconsistent statement was that before speaking to the sheriff she had spoken to Leibert and some of his friends (*see id.* at 795), and that "everybody else was saying it too" (*id.* at 786).

**18.** The 380 cartridges and bloody, bullet-ridden coat are physical evidence that Usher was shot, but do not, in any way, link Noble or his co-defendants to the crime.

**19.** The Supreme Court heard oral argument on this question on October 4, 1999 in *Williams v. Taylor,* 1999 WL 813784 (Oct. 4, 1999). For a transcript of the argument, see *Williams v. Taylor,* 1999 WL 813784 (Oct. 4, 1999). In light of the protracted nature of

According to one view, first advanced in *Lindh v. Murphy*, 96 F.3d 856 (7th Cir. 1996) (en banc), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the words "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States" state the relevant standard only when a claim involves a pure question of law. *See id.* at 870; *Neelley*, 138 F.3d at 923–24. When the claim involves a mixed question of law and fact, however, the federal court acts pursuant to the clause referring to an "unreasonable application of ... clearly established Federal law," and exercises more deferential review. *See Neelley*, 138 F.3d at 924; *Drinkard*, 97 F.3d at 769; *Lindh*, 96 F.3d at 870.[20] Another approach, originating with *O'Brien v. Dubois*, 145 F.3d 16, 24 (1st Cir.1998), focuses on the portion of § 2254(d) that refers to Federal law "as determined by the Supreme Court of the United States." A federal court following this approach must review state court decisions and determine, first, whether the Supreme Court has prescribed a "governing rule," which exists if a Supreme Court decision "by virtue of its factual similarity ... or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations can fairly be said to require a particular result in a particular case." *O'Brien*, 145 F.3d at 25. If so, then the court reviews the state court decision using the "contrary to" clause, whether the question is a pure question of law or a mixed question, and grants relief if the state court reached a different result than that required by the Supreme Court's governing rule. If not, then the habeas court applies the "unreasonable application clause," in which case the state court decision "must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *O'Brien*, 145 F.3d at 25; *see also Matteo*, 171 F.3d at 891 ("whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified").[21] Finally, the third approach, articulated in *Williams v. Taylor*, 163 F.3d 860 (4th Cir. 1998), *cert. granted*, —— U.S. ——, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999), com-

these proceedings, and our concern that the Petitioner may be detained improperly, we do not believe it would be appropriate to defer further resolution of this petition pending a decision in that case. Moreover, for the reasons set forth below, we do not anticipate that the Court's decision in *Williams v. Taylor* will affect the resolution of this case.

**20.** This approach has been followed in the following cases: *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir.1998), *cert. denied*, 525 U.S. 1075, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999); *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir.), *cert. denied*, 522 U.S. 819, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997); *Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir.1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997); *Glover v. Portuondo*, 96 Civ. 7616(JGK), 1999 WL 349936 (S.D.N.Y. May 28, 1999); *Millan v. Keane*, 97 Civ. 3874(JGK), 1999 WL 178790 (S.D.N.Y. Mar. 31, 1999); *Montalvo v. Portuondo*, 97 Civ. 3336(RWS), 1998 WL 851589 (S.D.N.Y. Dec. 9, 1998); *Natal v. Bennett*, 98 Civ. 1872(RWS), 1998 WL 841480 (S.D.N.Y. Dec. 3, 1998); *Carromero v. Strack*, 98 Civ. 3519(LAP), 1998 WL 849321 (S.D.N.Y. Nov.

19, 1998); *Rodriguez v. Bennett*, 98 Civ. 580(LBS), 1998 WL 765180 (S.D.N.Y. Nov. 2, 1998); *Redd v. Quinones*, 98 Civ. 2604(LBS), 1998 WL 702334 (S.D.N.Y. Oct. 7, 1998); *Fernandez v. Dufrain*, 11 F.Supp.2d 407 (S.D.N.Y.1998); *Morgan v. Bennett*, 96 Civ. 4106(ERK), 1998 WL 315135 (E.D.N.Y. May 27, 1998); *Ramirez v. Senkowski*, 7 F.Supp.2d 180 (E.D.N.Y.1998); *Smalls v. Batista*, 6 F.Supp.2d 211 (S.D.N.Y.1998); *Smith v. Sullivan*, 1 F.Supp.2d 206 (W.D.N.Y.1998); *Mobley v. Stinson*, 94 Civ. 5911(HB), 1997 WL 80587 (S.D.N.Y. Feb. 26, 1997).

**21.** The *O'Brien* approach has also been adopted, with a slight modification, in *Matteo v. Superintendent*, 171 F.3d 877, 891 (3d Cir. 1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999). It has also been applied in *Lurie v. Wittner*, 75 F.Supp.2d 117 (S.D.N.Y.1999); *Chance v. Kupec*, 96 Civ. 2204(AHN), 1998 WL 846740 (D.Conn. Nov. 18, 1998); *Bragdon v. Warden*, 96 Civ. 1840(AHN), 1998 WL 846738 (D.Conn. Nov. 18, 1998).

bines elements of both and provides that "habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." *Id.* at 865 (quoting *Green v. French*, 143 F.3d 865, 870 (4th Cir.1998)) (internal quotation marks omitted).

■ It is our view that the trial court's decision to exclude Yamagata's alibi testimony was erroneous, *see supra* Part II(B), and harmful, *see supra* Part II(C). To grant relief, however, we must determine whether that error was "contrary to" or "an unreasonable application of" clearly established federal constitutional law, as those terms have been construed by the various circuit courts. We believe that under any interpretation of those terms, the deprivation that occurred here entitles the Petitioner to a writ of habeas corpus.

The trial court's error, and the Appellate Division's erroneous affirmance thereof, involve pure questions of law. The trial court did not consider whether defense counsel had wilfully or in bad faith failed to comply with the alibi notice requirement; it merely stated that there was no "acceptable reason" and, on that basis, excluded the testimony. The court's error, therefore, does not lie in its application of the *Taylor* standard to the particular facts of this case; it lies in the fact that the court applied the wrong standard. Similarly, the Appellate Division affirmed that error while applying the wrong harmless error standard. The *Lindh* approach, therefore, requires us to apply the "contrary to" clause of § 2254(d). Moreover, both the trial court's and the Appellate Division's decisions were erroneous because they deviated from directly controlling decisions of the United States Supreme Court. The trial court's ruling was contrary to *Taylor*; the Appellate Division's was contrary to *Chapman*. The *O'Brien* approach as well, therefore, would require us to apply the "contrary to" clause. Because, for the reasons already

stated, we are convinced that the exclusion of Yamagata's testimony was contrary to clearly established Federal law, Noble's petition is granted on the ground that his conviction was obtained in violation of the Compulsory Process Clause.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

A claim that one has been deprived of the effective assistance of counsel, on the other hand, involves a mixed question of law and fact. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citation omitted); *Ventura v. Meachum*, 957 F.2d 1048, 1055 (2d Cir.1992) (citation omitted). However, it is a mixed question of law and fact as to which the Supreme Court has set forth a governing rule. While the *Lindh* approach would, therefore, require us to apply the deferential "unreasonable application" clause of § 2254(d)(1), the *O'Brien* approach would lead us to ask whether the decision of the state court was contrary to the governing rule set forth in *Strickland*. Nevertheless, we believe that a choice between those two approaches is not necessary in this case. For the reasons set forth below, we believe that the Appellate Division's application of *Strickland* to this case was an unreasonable application. Because we cannot conceive of how a decision can be an unreasonable application of a rule but somehow be not contrary to that rule, we conclude that under either approach a writ of habeas corpus is warranted.

### A. The *Strickland* Standard

■ To prevail on a claim of ineffective assistance of counsel, the petitioner must show, first, that his counsel's performance at trial "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. In evaluating trial counsel's performance, courts must be "deferential," making "every effort ... to eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. 2052. The

"court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* As a result, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052. Consequently, "[t]he fact that counsel is prepared and familiar with the relevant facts and legal principles is usually sufficient to defeat a claim that trial counsel was ineffective." *Farrington v. Senkowski*, 19 F.Supp.2d 176, 179 (S.D.N.Y.1998) (quoting *United States v. DiPaolo*, 804 F.2d 225, 234 (2d Cir.1986)).

Secondly, if the Petitioner is able to show that his counsel's performance fell below an objective standard of reasonableness, he also must demonstrate that the performance caused him substantial prejudice. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 (explaining that petitioner must show that ineffectiveness had an "effect on the judgment."). "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* In other words, counsel's errors must undermine our confidence in the trial's outcome. *Id.*

B.  Noble's Counsel's Errors

In this case, Petitioner claims that his counsel was ineffective in four particulars: he (1) failed to provide the government with a notice of alibi defense; (2) failed to object to improper statements made by the prosecutor; (3) failed to obtain the testimony of Lt. Whalen; and (4) offered evidence for credibility purposes when it

should have been offered as substantive evidence. The Appellate Division rejected Noble's argument on direct appeal, explaining only that it believed the challenge was a "simple disagreement with trial strategies and tactics." *See People v. Noble*, 209 A.D.2d 735, 618 N.Y.S.2d 123, 124 (N.Y.App.Div.1994). The court also stated that the alleged errors did not amount to constitutionally defective representations "[w]hen viewed in totality." *Id.*

■■■ We believe that only one of counsel's alleged errors—the failure to file the alibi notice—entitles the Petitioner to relief. The other three errors are either unsupported by the record[22] or did not cause substantial prejudice.[23] With respect to the failure to file the alibi notice, however, we simply do not see how any reasonable jurist can attribute that failure to a strategic choice of trial tactics. To be sure, "the decision ... to pursue a particular defense is a tactical choice," *Franza v. Stinson*, 58 F.Supp.2d 124, 155 (S.D.N.Y. 1999), and there are numerous cases in which courts have rejected federal habeas challenges alleging that trial counsel failed to present alibi testimony, *see, e.g., Lawson v. Caspari*, 963 F.2d 1094, 1096 (8th Cir.1992); *Allah v. Kelly*, 32 F.Supp.2d 592, 599 (W.D.N.Y.1998); *Nieves v. Kelly*, 990 F.Supp. 255, 264–65 (S.D.N.Y.1997); *Munoz v. Keane*, 777 F.Supp. 282, 288–89 (S.D.N.Y.1991). But those cases generally involved a decision not to pursue an alibi defense, which the reviewing court finds to have been reasonable. In this case, Noble's lawyer decided to pursue an alibi defense, but was unable to present that

---

**22.** For example, Noble claims that his lawyer offered Yamagata's testimony about the Cat, Shaka, and Gary altercation for impeachment rather than as substantive evidence. Although the court seems to have excluded it on that basis, our review of the record reveals several instances in which counsel clearly stated that he was offering the evidence for substantive purposes. (*See* Tr. at 579, 580, 585, 593.) Similarly, the claim that counsel failed to object to improper comments made by the prosecutor is belied by the fact that counsel did object repeatedly. (*See, e.g., id.* at

870, 871, 877, 881, 885.) On a few occasions, those objections were sustained and prompted curative instructions. (*See, e.g., id* at 881, 885.)

**23.** Even if defense counsel's performance was objectively unreasonable in failing to produce Lt. Whalen as a witness, that error caused no prejudice since Nurse Hoar testified to the relevant conversation that Whalen would have, presumably, described.

defense because of his misinterpretation of the governing discovery rules. In no sense, can that failure be attributed to a strategic choice. The decision made by Noble's trial counsel not to file an alibi notice was based on counsel's belief that Yamagata's testimony did not constitute an alibi—a belief we are compelled to find to have been erroneous, *see supra* at 456–57. Errors caused by counsel's ignorance of the law are errors that run afoul of the objective standard of reasonableness. *See Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (rejecting argument that counsel's errors were strategic choices because they were based on ignorance of the law). Although research has not disclosed any New York cases that had been decided as of the time of Noble's trial,[24] which directly address the question of whether the "scene of the crime" is defined by the Indictment or by the Government's discovery responses, nor any cases indicating that testimony that the accused was inside a building when the crime occurred outside is an alibi, we believe that the plain language of the statute[25] would lead any reasonably competent lawyer to err on the side of caution by filing the requisite notice. Counsel's failure to do so here was "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

Moreover, Noble clearly suffered substantial prejudice as a result. As set forth above, *see supra* Part II(C), the prosecution's contention that Melvin Walker testified to the same alibi is not supported by the record and, even if it were, would be inadequate in light of the strong challenges to Walker's credibility that were made by the prosecution. We are unable to conclude, as we must to find a lack of prejudice, that the trial court's exclusion of

Yamagata did not effect the verdict. That exclusion, caused by trial counsel's misinterpretation of state discovery rules, undermines our confidence in the verdict and, therefore, leads us to conclude that the performance of Noble's trial counsel was constitutionally deficient. Ineffective assistance of counsel, therefore, is an alternative ground for our decision to grant Noble's petition and issue a writ of habeas corpus.

## IV. PROSECUTORIAL MISCONDUCT

Petitioner cites four instances of prosecutorial misconduct that, he alleges, deprived him of a fair trial. He claims that the prosecutor (1) told the jury he was a member of a drug gang without there being any basis in the record, (2) asked leading questions, (3) stated his personal beliefs, and (4) disregarded the court's instructions.

■■■ Federal law applies to claims for prosecutorial misconduct through the Due Process Clause. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (federal review of state prosecutors' conduct is "the narrow one of due process, and not the broad exercise of supervisory power that it would possess in regard to its own trial court.") (internal quotation marks and citation omitted); *see also Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998) ("In order to grant relief, we would have to find that the prosecutor's comments constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights.") (citations omitted). To grant relief, then, we must conclude that the Appellate Division's decision was an "unreasonable application" of the Due Process Clause.

---

**24.** At least one decision rendered after Noble's trial, *People v. Rosado,* 153 Misc.2d 477, 583 N.Y.S.2d 130 (N.Y.Sup.Ct.1992), reached the same conclusion as the trial court in this case, i.e., that testimony that a defendant was inside a building when a crime allegedly occurred outside the building constituted an alibi and required notice, *see id.* at 131, but that a defendant's own alibi testimony could not be stricken.

**25.** *See supra* note 7.

The Due Process Clause would justify habeas corpus relief due to prosecutorial misconduct only if that misconduct was so severe as to cause an unfair trial. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("not every trial error ... constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice' "); *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998) (petitioner "must show 'that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.") (quoting *Bentley v. Scully,* 41 F.3d 818, 823 (2d Cir.1994)); *United States v. Bautista,* 23 F.3d 726, 732 (2d Cir.1994) (explaining that petitioner must show misconduct and "substantial prejudice") (citations omitted). After examining the record, the Appellate Division concluded that the examples of prosecutorial misconduct cited by Mr. Noble were not "so pervasive and egregious as to deprive defendant of a fair trial." *People v. Noble,* 618 N.Y.S.2d at 124. We agree. The record reveals numerous instances in which the trial court sustained objections to the prosecutor's conduct and instructed the jury appropriately. (*See, e.g.,* Tr. at 116, 139, 143, 875, 885, 921.) These kind of curative efforts made by the trial court are generally sufficient to satisfy the Due Process Clause. *See Tankleff,* 135 F.3d at 252. More specifically, one of the examples of misconduct cited by the Petitioner Mr. Noble—references to drugs without a basis in the record—has been reviewed by a federal court on at least two occasions and found to not constitute a violation of due process. *See Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir.1994); *Bautista,* 23 F.3d at 732. We do not conclude, therefore, that the Appellate Division's conclusion was an "unreasonable application" of the Due Process Clause, nor was it contrary to any governing rule articulated by the Supreme Court.

**26.** We have reviewed Petitioner's additional claims and find them to be without merit.

## CONCLUSION

Noble's petition for a writ of habeas corpus is granted on the ground that the preclusion of exculpatory testimony violated the Compulsory Process Clause and, in the alternative, on the ground that defense counsel's failure to file notice of an alibi defense deprived Noble of the effective assistance of counsel. The petition is denied on the ground of prosecutorial misconduct.[26] Respondent is directed either to release the Petitioner from custody or to retry him within 90 days of this order. This order shall be stayed pending appeal, provided that Respondent files a Notice of Appeal within 30 days of this order.

SO ORDERED.